IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re<br><br>A & E Family Investment, LLC,<br><br>    Debtor. | Chapter 7<br><br>Case No. 05-16331<br><br>MEMORANDUM DECISION<br><br>(Opinion to Post) |

## **I. PRELIMINARY STATEMENT**

    This matter comes before the Court on Chapter 7 Trustee Lothar Goernitz's (the "Trustee") "Application for Order Directing Title Security Agency of Arizona dba Premier Title Group to Show Cause Why it Should not be Held in Contempt of Court" ("Application"), filed September 6, 2006. This Court issued the requested Order to Show Cause on September 8, 2006, setting a hearing on the matter. On September 22, 2006, Title Security of Arizona dba Premier Title Group ("Premier") filed its "Response to Trustee's Application for Order Directing Title Security Agency of Arizona, d/b/a/ Premier Title Group to be Held in Contempt of Court" ("Response"). A hearing on the matter was held on October 16, 2006, at which time the Trustee requested additional time to provide the Court with further legal support for his position. The Court ordered the Trustee to submit any supplemental Arizona law on which he intended to rely by October 20, 2006. Premier was ordered to file its Response by November 3, 2006; thereafter the matter would be deemed under advisement.

This Decision shall constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52, Bankruptcy Rule 7052. The Court has jurisdiction over this matter, and this is a core proceeding. 28 U.S.C. §§ 1334 and 157 (West 2006).

## **II. FACTUAL DISCUSSION**

The Debtor filed its Chapter 11 petition on August 31, 2005, and on December 29, 2005, Lothar Goernitz was appointed the Chapter 11 Trustee. The Debtor's principal asset was real property located at 4612 E. Foothills Drive, Paradise Valley, Arizona ("Property"), which was heavily encumbered by a number of liens and encumbrances. The Trustee concluded that he was unable to reorganize the Debtor, and the case was converted to a Chapter 7 on February 9, 2006. Ultimately the Trustee determined to sell the Debtor's Property. On March 15, 2006, the Trustee filed his Motion to Sell the Property for the amount of $4,900,000[1] to David Yates or his nominee ("Buyer"). The Trustee estimated that the amount of the liens and encumbrances against the Property approximated $4,735,742, so that the creditors of the estate would benefit from such a sale. The Buyer agreed to make a deposit of $100,000. However, the second lienholder on the Property had already filed a motion for relief from the automatic stay and opposed the sale. While the Motion to Sell the Property was pending, the Trustee filed a Notice of Addendum with the Court on April 6, 2006, extending the proposed closing on the Property to May 14, 2006, but increasing the purchase price by $30,000 to $4,930,000 to cover any accrued interest to the lienholders as a result of the delay in the closing. The deposit was increased from $100,000 to $330,000, which included a cash component of $230,000, and required the Buyer to execute a promissory note ("Note") in the amount of $100,000 in favor of the estate, and the deposit became non-refundable as of April 4, 2006.[2]

---

[1] See Docket Entry No. 76.

[2] See Docket Entry No. 81.

2

The Court conducted a hearing on the Trustee's Motion on April 18, 2006, and approved the sale, overruling the objections of the second lienholder. The Court made it clear to the parties that if the sale did not close in a timely manner, the Court would vacate the stay to allow the second lienholder to foreclose on its lien. No sale order was initially submitted by the Trustee.[3] On May 16, 2006, the Court executed the Order approving the sale of the Property; however, at this point, the Buyer should have deposited the sum of $330,000, which had become non-refundable.[4] Because of a clerical error, the Trustee submitted a Motion to Set Accelerated Hearing on his Motion to Amend the Order Authorizing Sale to the Court on May 17, 2006, which provided for a closing of the sale transaction on May 18, which was denied.[5] Finally, on May 18, 2006, this Court executed a Stipulated Amended Sale Order[6] as the final order governing the Trustee's sale of the Property.

The May 18, 2006 Order stated that if the Buyer failed to close escrow by May 18, 2006, the Buyer's deposit of $330,000, consisting of the earnest money deposit of $230,000 ("the Earnest Money") and the Note would be forfeited to the Trustee. After the sale failed to close on May 18, the Trustee made written demand on Premier for the turnover of the Earnest Money and the Note. On May 25, 2006, Premier contacted the Trustee to notify him that another party might be interested in purchasing the Property. However, by May 23, 2006, the Court had executed an order vacating the stay to allow the first and second

---

[3] The Court's electronic system reflects that the Trustee first submitted the Sale Order on May 16, 2006, and it was executed by the Court within 12 minutes of being received.

[4] See Docket Entry No. 86.

[5] See Docket Entries No. 87 and 88.

[6] See Docket Entry No. 90.

3

lienholders to foreclose on the Property.[7] The Trustee's counsel apparently notified Premier of the foreclosure or trustee's sale of the Property later in the day on May 25.[8]

In Premier's Response to the Order to Show Cause, and at the subsequent hearing, Premier argued that it had never been able to cash the Earnest Money checks and had never obtained the original Note. At the hearing on the Order to Show Cause, Premier's counsel stated that the Trustee should have been aware that Premier never had more than a copy of the Note. The Trustee alleged, however, that he was not made aware that Premier did not have the Earnest Money in its possession until Premier's Response was filed.[9]

The Response revealed that on March 14, 2006, Premier's escrow agent, a Ms. Roth, had received the Buyer's initial earnest money check for $100,000. At that time she had opened an escrow account and generated an escrow receipt; however, since she was in the process of leaving Camelback Title, where she was employed, and commencing employment at Premier, she cancelled the escrow account at Camelback Title and sent the check back to the Buyer, requesting that he change the payee on the draft to Premier. She then notified the Trustee of the circumstances surrounding the cancellation of the escrow, and the Trustee executed a facsimile copy of the escrow cancellation.[10] On April 5, 2006, Premier received the original Earnest Money check from the Buyer, in the amount of $100,000, with the payee now listed as Premier. It also received another check for the

---

[7] See Docket Entry No. 92.

[8] See "Reply in Support of Trustee's Application for Contempt Order" ("Reply"), Docket Entry No. 123, Exhibit B, at 1, ¶ 3.

[9] Premier asserted that it mailed letters on August 28, 2006, to the Trustee's attorneys, the Buyer's realtor, and the Trustee's realtor. The letters stated that the Buyer's Earnest Money checks had been returned to Premier for insufficient funds. See Response, Exhibit C. The Trustee's attorneys and realtor presented affidavits avowing that they had never received these letters. Reply, Exhibits E-G.

[10] See Reply, Exhibit K.

4

additional earnest money in the amount of $130,000.[11]  Premier's accounting department presented the checks for payment, but the payor bank declined to honor the checks because there were insufficient funds in the Buyer's account, and the checks were returned to Premier.[12]  It is unclear when the checks were actually received by Premier.  Premier alleges that Ms. Roth only discovered the return of the dishonored checks after the Trustee's first written demand for the turnover of funds because of the Buyer's failure to close the escrow on or about May 18.[13]  Premier alleges that Ms. Roth did not notify Premier's management or the Trustee;[14] rather, in an attempt to remedy the situation, Ms. Roth notified the Buyer's realtor and requested that the Buyer honor the checks.  When Ms. Roth presented the checks for payment to the Buyer's bank in June, the checks were again not honored.  In her affidavit, Ms. Roth stated that she did not notify her supervisor about the dishonor of the Buyer's checks until she received the Trustee's demand letter in August.[15]

Meanwhile, the Trustee continued with his efforts to obtain possession of the Earnest Money and the Note, to no avail.  The Trustee filed a "Motion to Enforce the Amended Sale Order by Directing Premier Title Company as Escrow Agent to Deliver Forfeited Escrow Deposit to Trustee" on June 15, 2006.  However, Premier did not respond to the Motion, nor did it appear at the hearing on the Motion on August 10, 2006.  The Court

---

[11] As noted in the factual discussion, the Buyer initially proposed a deposit of $100,000, which was increased to $130,000 because of the delay of the closing to May 14, 2006. Subsequently the cash component of the deposit was increased to $230,000, and the Buyer also provided a Note in the amount of $100,000.

[12] The Court has reviewed all of the Exhibits presented by the parties, and although Premier initially received the Earnest Money checks on or about April 5, 2006, it is unclear when the checks were presented to the bank.  Ms. Roth stated, at her deposition, that she believed the accounting department simply placed the dishonored checks in the file between April 5, 2006, and May 19, 2006, when she discovered them.  Reply, Exhibit H at 81-82, 124.

[13] See Reply at 8-9.

[14] Id.

[15] See Reply, Exhibit H at 134.

5

granted the Motion by Order dated August 15, 2006,[16] and the Trustee continued, without success, to attempt to obtain the Earnest Money and the Note from Premier.

On August 28, 2006, the Trustee stated to Premier that if the Earnest Money and the Note were not in his possession within the week, the Trustee would file a motion seeking to hold Premier in contempt of Court for failure to comply with the August 15, 2006 Order. On August 28, 2006, Ms. Stobbe, another Premier employee and the supervisor of Ms. Roth, wrote a letter to the Trustee, informing him that there had been insufficient funds in the Buyer's account to cover the Earnest Money checks at the time of presentment. Apparently, neither the Trustee nor his counsel received this letter;[17] and the Trustee proceeded to file the current Application for an Order to Show Cause.

By the time of the October 16, 2006 hearing, the Trustee was aware that Premier had been unable to obtain the Earnest Money from the Buyer and that Premier had only obtained a copy of the Note. Despite the fact that Premier had never obtained possession of the Earnest Money, the Trustee demanded that Premier turn over its own funds as the Earnest Money. In support of this position, the Trustee argued that Premier owed a fiduciary duty to all parties involved in the transaction. When its employee allegedly breached this duty, Premier became absolutely liable through <u>respondeat superior</u> to turn over the Earnest Money. Because Premier did not so act, the Trustee now requests that this Court hold Premier in civil contempt and award sanctions in the amount of $330,000 (the sum of the value of the missing Earnest Money and the Note) to the Trustee, along with payment of his attorneys' fees and costs. Premier has turned over a copy of the Note to the Trustee.

### III. LEGAL DISCUSSION

The question presented in this case is whether Premier had absolute liability to turn over funds to the Trustee, although Premier never possessed said funds. As an

---

**16** See Docket Entry No. 104.

**17** See Note 9, above.

6

alternative ground for relief, the Trustee requests that Premier be held in civil contempt of court for its failure to comply with a final order of this Court.

In a bankruptcy case, any entity having property of the estate in its possession, custody, or control, is generally required to turn over that property to the trustee if the trustee may use, sell, or lease the property, or if the debtor may exempt the property. 11 U.S.C. § 542 (West 2006). Because this Code provision requires that the entity have possession of such property, an entity that is not in possession of the property cannot be compelled to return the property to the estate. The courts have generally recognized one exception to the rule. When a fiduciary breaches a duty owed to a party by wrongfully disbursing the funds, the fiduciary may have an absolute liability to return the amount of the funds to the party, although the funds are no longer in the fiduciary's possession. Tivon v. England, 484 F.2d 639, 641 (9th Cir. 1973) (holding that "a fiduciary such as an escrow agent may be held accountable in a turnover proceeding for funds disbursed contrary to the bankruptcy law"); see, e.g., Miller v. Craig, 27 Ariz. App. 789, 791, 558 P.2d 984, 986 (1977).

It is well established that in Arizona, "[t]he relationship of the escrow agent to the parties to the escrow is one of trust and confidence." Maganas v. Northroup, 135 Ariz. 573, 576, 663 P.2d 565, 568 (Ariz. 1983). Thus, an escrow agent may be held absolutely liable for breaching a fiduciary duty to any or all parties to the escrow agreement. Arizona's common law imposes two distinct fiduciary duties on escrow agents. The first is the duty of strict compliance with the terms of the escrow agreement; the second is the duty to disclose fraud when the escrow agent has actual knowledge of the fraud and failure to disclose the fraud would assist in its perpetration. Id. at 576, 663 P.2d at 568; Sherman v. First American Title Ins. Co., 201 Ariz. 564, 570, 38 P.3d 1229, 1235 (Ariz. App. 2002). Accordingly, to be absolutely liable for breaching its fiduciary duty, an escrow company must breach the escrow contract or assist in perpetrating a fraud.

7

Arizona's Legislature has imposed additional duties on escrow agents by statute. Under A.R.S. § 6-834 (A) (West 2006), an escrow agent must immediately deposit any checks it receives. Escrow companies must implement an internal control structure to ensure employees are properly supervised. Id. § 6-841(A). However, enforcement of these statutes has been delegated to the superintendent of financial institutions. Id. § 6-101. The statutes create no private right of action to an aggrieved party; however, this failure does not limit any common law or other statutory rights of action a party may have. Id § 6-835.

The Trustee cites a number of cases from other jurisdictions in which escrow agents breached their fiduciary duties and were held liable for reimbursing the injured parties. See Katleman v. U.S. Communities, Inc., 249 N.W.2d 898 (Neb. 1977) (holding that where escrow agent held earnest money check without depositing it, agent breached its fiduciary duty and was liable to injured party for the full amount of the earnest money check); Chilton v. Pioneer Nat'l Title Ins. Co., 554 S.W.2d 246 (Tex. App. 1977) (holding that where escrow company held earnest money checks instead of depositing them, a jury question existed as to whether the escrow company was negligent); Mefford v. Security Title Ins. Co., 199 Cal. App. 2d 578 (Cal. App. 1962) (holding that, where escrow company held earnest money checks instead of depositing them, escrow company could be liable for negligence; but escrow company was not liable because plaintiffs themselves did not comply with escrow instructions and caused their own loss). Although these cases do not apply Arizona law regarding breach of an escrow agent's fiduciary duties, they are instructive. Each of the cases relied upon by the Trustee consider factual situations in which the escrow companies held the checks without presenting them for payment.

In the case at bar, Premier did not hold the Earnest Money checks indefinitely, but it does acknowledge that it received the checks on or about April 5. Moreover, the Court conducted the hearing on the Trustee's Motion to Sell on April 18, 2006 and approved the sale at that time. The Trustee argues that said facts alone should require that Premier be held absolutely liable to the estate. However, the Trustee's delay in obtaining

8

a final sale order from the Court necessarily caused confusion. In essence a delay in finalizing the sale transaction perhaps led to Premier's ultimately simply placing the Earnest Money in the file. Even considering the delivery of the Earnest Money to Premier on April 5, 2006, Premier still presented the checks for payment and learned of their dishonor within a relatively short period of time, since Ms. Roth stated that by May 19, 2006, a day after the Sale Order was finalized, she found the dishonored checks from the Buyer in the file. To a certain extent, the delay in the finalization of the Sale Order by the Trustee and the parties allowed Premier's presentation of the Earnest Money checks for payment to be in a timely manner.

The Trustee also relies on Ninth Circuit and Arizona cases involving the wrongful disbursement of funds, which are inapposite. See Tivon v. England, 484 F.2d 639, 641 (9th Cir. 1973) (holding that where funds were disbursed contrary to bankruptcy law, the escrow agent was liable for the amount of the wrongfully disbursed funds); see, e.g., Miller v. Craig, 27 Ariz. App. 789, 791, 558 P.2d 984, 986 (1977) (holding that where escrow agent returned earnest money to buyer without notifying seller contrary to the escrow agreement, escrow agent was liable for the amount of the wrongfully disbursed funds). In each case, the escrow company's wrongful disbursement of the funds actually caused the loss the injured parties suffered. In this case, no monies were disbursed contrary to the escrow agreement or applicable law. No monies were disbursed at all. Premier also did not breach the terms of the escrow agreement.[18] See Maganas, 135 Ariz.at 576, 663 P.2d at 568.

The Trustee argues that an escrow agent who represents that it is holding earnest money funds in escrow should be estopped from asserting, as a defense to an action by a party seeking to recover those funds, that it never had such funds. The Trustee believes that such a decision would be consonant with the duties imposed on the escrow agents by Arizona law and those cases which allow a recovery to injured parties when escrow agents

---

**18** The parties never presented a copy of the escrow agreement, so it is impossible, on this record, for the Court to conclude that there was any breach of the escrow agreement.

9

Case 2:05-bk-16331-SSC    Doc 132    Filed 01/16/07    Entered 01/16/07 10:33:48    Desc
Main Document      Page 9 of 16

deviate from the terms of the escrow agreement. However, as noted above, there are only two circumstances under which an escrow agent breaches its fiduciary duties under Arizona law. Maganas, 135 Ariz.at 576, 663 P.2d at 568. The Trustee has presented no evidence that the escrow agreement was breached.[19] The question thus becomes whether the escrow agent knew of certain facts regarding the perpetration of a fraud on the Trustee and failed to act on them. The only evidence submitted reflects that a Premier employee discovered the Earnest Money checks would not be honored only after the sale did not close on May 18, 2006. Moreover, Premier was not a cause of the checks being dishonored, and the final order approving the sale of the Property was not docketed until May 18, 2006.

Although the Trustee may have a cause of action against the Buyer pursuant to A.R.S. § 12-671(A) (2006), or against Premier for negligence, this Court finds, and concludes as a matter of law, that the Trustee has failed to show a breach of the escrow agreement by Premier or Premier's participation in a fraud upon the Trustee.[20] Premier, as an

---

19 See note 18, above. The Court does not have a copy of the agreement.

20 The Trustee argues that Premier's knowledge that the Earnest Money checks had been dishonored, coupled with its failure to notify the Trustee, are sufficient to constitute a fraud. See A.R.S. § 12-671(A) (West 2006) and A.R.S. §§ 13-2101 et seq. (West 2006). However, there are material differences between the standard of proof necessary to find a check drafter who presents a "bad check" liable, and that necessary to find a third party liable of fraud. While it is true that "intent to defraud" is required before one may be held liable under Section 12-671(A) for presenting a bad check, the standard of proof is similar to that of absolute liability. "Intent to defraud" may be proven without reference to any fact other than the balance in the check drafter's bank account during the relevant period of time. Id. § 12-671(C). A civil penalty (a statutorily defined fine) may be imposed. Id. § 12-671(C). However, in this case, Premier did not present an insufficient funds check; it was the Buyer who so acted.

As to a finding that Premier is liable on the basis of fraud, the requisite intent to defraud must be shown. See, e.g., A.R.S. §§ 13-2202, 13-2206, 13-2310-11. In order to be held liable for participating in a fraud on one of the parties to the escrow, "the facts actually known to the escrow agent [must] present substantial evidence of fraud." Sherman v. First American Title, 201 Ariz. 564, 570, 38 P.3d 1229, 1235 (Ariz. App. 2002) (emphasis in original). Prior to May 19, the day after the closing on the Property, Premier held Earnest Money checks reflecting insufficient funds in the Buyer's accounts. However, it is unclear from this record when Premier gained such knowledge. Moreover, without additional facts, it is unclear why a receipt of insufficient funds checks by Premier, within a little over 30 days

10

escrow agent, is a neutral depositary for escrow funds, but it does not have a duty to ensure that a party to an escrow transaction has sufficient funds in the party's account or that every check presented will be honored.  After the sale failed to close, Premier may have been negligent when it discovered that the Earnest Money checks that it had received from the Buyer had been dishonored, and failed to notify the Trustee.  However, such negligence, if it existed, is not sufficient for this Court to impose absolute liability on Premier requiring that Premier return funds to the Trustee in the amount of the Earnest Money and the Note.

The Trustee may pursue Premier in a negligence action; he may pursue the Buyer in an action on the dishonored checks or the Note.  However, the Trustee may not use a Motion to Compel Turnover to hold Premier absolutely liable for failing to turn over the Earnest Money and the funds representing the amount of the Note.  As noted above, the Court cannot compel a party to turn over property not in its possession.  See 11 U.S.C. § 542 (West 2006).

As an alternative ground for the relief requested, the Trustee requests that Premier be held in civil contempt of court for its failure to comply with this Court's turnover Order and that this Court enter a $330,000 judgment against Premier, representing the Earnest Money in the amount of $230,000 and the Note in the amount of $100,000.  Bankruptcy courts have the subject matter jurisdiction and the power to impose civil contempt sanctions in order to coerce compliance or to compensate an injured party.  In re Rainbow Magazine, 77 F.3d 278, 284 (9th Cir. 1996); In re Deville, 361 F.3d 539,  550-53 (9th Cir. 2004).  Yet it is

---

from the Buyer's presenting said checks to Premier, would prove that Premier was perpetuating a fraud on the Trustee.  The affidavit of Ms. Roth may reflect negligence, by her or Premier's accounting department, but not necessarily fraud.  The Court also did not obtain the final Sale Order from the Trustee until May 18, 2006, and the Property was sold almost immediately thereafter at a trustee's sale.  Therefore, it is difficult to hold Premier liable for fraud, when the facts indicate that negligence by one or more of the parties to the transaction may have ultimately led to a loss to the estate.

Moreover, the Trustee has not pled fraud with the requisite particularity, nor has he commenced an adversary proceedings alleging fraud.  Although the Court finds Premier's lack of candor and/or silence for a prolonged period of time untoward, the Court may not conclude that such conduct is fraudulent.

11

well settled that a party's present inability to comply with a court order is a complete defense to charges of contempt for failure to comply. U.S. v. Rylander, 460 U.S. 752, 757 (1983). The party raising the defense of inability to comply with a court order has the burden of persuasion. Id. Premier satisfied this burden by presenting the employees' affidavits that the Earnest Money checks were returned marked "NSF." Because Premier had no Earnest Money to turn over, it may not now be compelled to comply with this Court's Order to turn over the sum of $230,000, constituting the Earnest Money to be paid by the Buyer. Imposition of civil contempt sanctions would be an abuse of discretion. This Court cannot force compliance from a party that has proven its inability to comply.

Additionally, Premier cannot be ordered to pay the Trustee the amount of the Note. The Trustee has not disputed Premier's assertions that the Trustee was, or should have been, aware that only a copy of the Note was being held in escrow. Moreover, when an original promissory note is unavailable, an action may be brought on a copy of the note. It is undisputed that Premier turned its copy of the Note over to the Trustee. The Trustee may still seek damages on the Note from its maker, the Buyer. The Trustee has failed to show any basis, in law or in fact, to hold Premier absolutely liable for a failure to turn over the original Note.

Although Premier may not be held in civil contempt, this Court may nevertheless consider whether some type of sanction is appropriate for Premier's conduct. In the decision of Rainbow Magazine, the Ninth Circuit considered whether a bankruptcy court's imposition of sanctions, pursuant to its inherent power, on a nonparty to a bankruptcy case, was proper. 77 F.3d 278 (9th Cir. 1996). In that case, a principal of the debtor had orchestrated the debtor's bad faith filing, but had signed only the Statement of Financial Affairs. The lower court imposed Fed. R.Civ. P. 11 sanctions of $45,000 on the principal for executing the document, but relied on its inherent power to sanction to impose a sanction of almost $250,000 on the principal for his role in bringing about the bad faith filing. The Ninth Circuit affirmed, reasoning that the inherent power to sanction must necessarily be vested in

the lower federal courts "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." Rainbow Magazine at 283 (quoting Chambers v. Nasco, Inc., 501 U.S. 32, 43 (1991). In order to manage its cases, the bankruptcy court must have inherent power to sanction conduct which is outside the scope of statutorily sanctionable actions, such as abuse of process or vexatious or dilatory conduct. Id. at 284. Later cases have limited the holding in Rainbow Magazine, allowing a court the power to impose compensatory sanctions only. In re Dyer, 322 F.3d 1178, 1198 (9th Cir. 2003).

Given the facts in this case, the Court finds Premier's failure to communicate with the Trustee, its conduct concerning the Trustee's Motion to Enforce, including its absence at the hearing on August 10, 2006 on said Motion, and its subsequent inexplicable silence in the Response to the Order to Show Cause on the Motion to Enforce to constitute bad faith. Initially, Premier's employees may not have communicated in a timely manner with the Trustee, but there seemed to be no element of bad faith in their failure to do so. Indeed, after receiving the Trustee's May 19, 2006 demand letter,[21] Ms. Roth contacted the Buyer's real estate agent and believed that the Buyer would place sufficient funds in his account so that the Earnest Money checks would be honored. Such a course of action could only help, not harm, the Trustee and the estate. While the decision to pursue that course of action may have been erroneous or negligently made, there is no evidence that it was made with the intent to act in bad faith or harm the Trustee. Negligent conduct is not enough to support an award of sanctions under the Court's inherent authority. Fink v. Gomez, 239 F.3d 989, 992-93 (9th Cir. 2001).

However, Ms. Roth, or some other employee of Premier, should have taken additional action when the collected funds were not immediately received from the Buyer after Premier's May 19, 2006 discovery of the Buyer's dishonored checks. The Trustee continued to demand the turnover of the Earnest Money and Note from Premier. As noted

---

[21] It appears that the May 19 demand letter was directed to Ms. Roth alone. See Reply, Exhibit A.

13

above, he filed a Motion to Enforce Amended Sale Order By Directing Premier Title Company as Escrow Agent to Deliver Forfeited Escrow Deposit to Trustee ("Motion to Enforce"), on which a hearing was conducted on August 10, 2006. Premier failed to respond to the Motion and failed to appear at the August 10 hearing.[22] Although Premier may not be sanctioned solely for failing to comply with the Court's Orders when it lacks the ability to do so, there is no reason why Premier should not have responded to the Trustee's Motion to Enforce or appeared at the August 10 hearing. Even at the October 16, 2006 hearing on the Order to Show Cause, Premier presented no reason for its continuing delay to communicate with the Trustee, nor for its failure to appear at the August 10, 2006 hearing on the Motion to Enforce. At the Order to Show Cause Hearing, counsel for Premier only stated that Ms. Roth panicked and did not notify her supervisor, Ms. Stobbe, until late August 2006, that the Buyer's checks were dishonored. Such statements do not explain why Ms. Stobbe and Premier ignored the Trustee's Motion to Enforce and failed to appear at the August 10, 2006 hearing, when Ms. Stobbe had notice of both by Mid-June.[23] This contumacious behavior, while the Motion to Enforce was pending and after the August 10 hearing, has caused the estate and the Court to waste significant resources.

          Premier was given the opportunity to explain its silence not only when Ms. Stobbe first learned of the Buyer's dishonored Earnest Money checks, but also later on, in a Response to the Motion to Enforce, at the August 10, 2006 hearing as to which Premier received notice, in its Response to the Order to Show Cause issued by the Court, and again at the October 16 hearing on the Order to Show Cause. It has failed to provide a plausible

---

[22] Premier had notice of the hearing through its employee, Ms. Roth, and her supervisor, Ms. Stobbe, both of whom were served with the Notice of the Hearing via mail on June 19, 2006. See Docket Entry No. 99. Additionally, the certificate of mailing attached to the Motion to Enforce requesting a hearing indicates that it was sent via mail and email to both Ms. Roth and Ms. Stobbe at Premier on June 15, 2006. See Docket Entry No. 97. Accordingly, the Court finds Premier's assertion that management was unaware of the problem until late August to be implausible and not supported by the evidence presented to the Court.

[23] See Note 22, above.

14

explanation for this ongoing failure to provide the Trustee and the Court with any information.  Given the lack of sufficient reason for Premier's systematic refusal to communicate, the Court must conclude that the delay constituted the bad faith, vexatious conduct of the type sanctionable under the Court's inherent authority.  See Rainbow Magazine, 77 F.3d at 283.  "As long as a party receives an appropriate hearing, . . . the party may be sanctioned for abuses of process occurring beyond the courtroom."  Chambers v. NASCO, 501 U.S. 32, 57, 111 S.Ct. 2123, 2140 (1991).  It is clear that a court may assess attorney's fees when a party has acted vexatiously or in bad faith, not only to police transactions concerning the court itself, but also to make a party whole "for expenses caused by his opponent's obstinacy."  Id., 501 U.S. 45-46, 111 S.Ct. 2133 (quoting Hutto v. Finney, 437 U.S. 678, 689, n.14, 98 S.Ct. 2565, 2573, n.14 (1978)).  The Trustee has adequately demonstrated that Premier's "obstinacy" was bad faith, vexatious conduct, which ultimately caused the Trustee to expend significant attorneys' fees and costs.  Based upon Ninth Circuit and Supreme Court authority, it is appropriate for the Court to impose a narrowly tailored sanction on Premier consisting of compensatory damages.  The Court finds the amount of attorneys' fees and costs incurred by the Trustee from the preparation of his Motion to Enforce until the rendering of the Decision as an appropriate compensatory award.[24]

.

---

[24] The Trustee has requested a damage award in excess of $330,000.  However, the Court's inherent authority to sanction authorizes compensatory sanctions only.  In re Dyer, 322 F.3d 1178, 1196-98.  The Court may not consider levying punitive damages.  Id.  Given the amount of compensatory damages requested by the Trustee in this matter, yet fully taking into account the reprehensible conduct of Premier, from Mid-June 2006 through the end of August 2006, the Court finds that the award of $330,000 to be so excessive that it approaches a punitive damage award.  cf. BMW of North America, Inc. v. Ira Gore, Jr., 517 U.S. 559, 575, 580, 583, 116 S.Ct. 1589 (1996).  Premier's silence after being served with the Motion to Enforce, its failure to attend the duly notice hearing on August 10, 2006, and its ongoing silence for a period of two months, is misconduct for which the Trustee should receive his attorneys' fees and costs, but any award beyond that would violate Constitutional due process.  See Id.

## IV. CONCLUSION

Based upon the foregoing, the Court concludes that the Trustee has failed to establish that Premier should be held absolutely liable to the Trustee for inadvertently failing to obtain $230,000 in Earnest Money from the Buyer or the original Note.  Similarly, Premier cannot be held in civil contempt, because it does not have the funds in its possession. However, the silence of Premier from Mid-June 2006 through August 2006, and its failure to attend the August 10, 2006 hearing on the Trustee's Motion to Enforce support the recovery of the Trustee's attorney's fees and costs in this matter for the period from the preparation of the Motion to Enforce by counsel for the Trustee until the rendering of this Decision.  The inherent ability of this Court to sanction a party had been properly invoked.

The Trustee also is not barred from commencing a separate action or proceeding against Premier or the Buyer as outlined in this decision.  The Court will execute a separate order incorporating this Memorandum Decision.

**DATED this 16th day of January, 2007.**

*[signature]*
**Honorable Sarah Sharer Curley**
**United States Bankruptcy Judge**

BNC to Notice.