1
2
3
4
5                IN THE UNITED STATES BANKRUPTCY COURT

6                     FOR THE DISTRICT OF ARIZONA

7

8    IN RE:                            | In Chapter 7 Proceedings

9    A & E FAMILY INVESTMENT, LLC,     | Case No. 05-bk-16331

10

11                          Debtors.   | MEMORANDUM DECISION ON
                                         TRUSTEE'S MOTION FOR
12                                       RECONSIDERATION

13

14                     I. PRELIMINARY STATEMENT

15          This matter comes before the Court on the "Motion for Partial Reconsideration of,

16   and Partial Relief from, the Court's Memorandum Decision and Order on the Trustee's

17   Application for a Contempt Sanction Against Title Security Agency of Arizona" ("Motion for

18   Reconsideration" or "Motion") filed by the Chapter 7 Trustee Lothar Goernitz ("Trustee") on

19   January 29, 2007.  Title Security Agency of Arizona, dba Premier Title ("Premier") filed its

20   "Opposition to Chapter 7 Trustee's Motion for Partial Reconsideration of the Court's

21   Memorandum Decision and Order on the Trustee's Application for a Contempt Sanction"

22   ("Response") on February 27, 2007.  Oral argument was held on March 6, 2007, at which time

23   the matter was taken under advisement.

24

25                     II.  INTRODUCTION

26          On January 19, 2007, the Court issued its Memorandum Decision on the Trustee's

27   "Application for Order Directing Title Security Agency of Arizona dba Premier Title Group to

28                                      1

Show Cause Why it Should Not be Held in Contempt of Court" ("Application").[1]  The Trustee

had asked the Court to hold Premier absolutely liable for the sum of $330,000, representing an

earnest money deposit that Premier had received in the form of checks and a promissory note

from a buyer who had insufficient funds in his bank account to cover said checks.  The Trustee

argued that Premier should be held liable for the $330,000 sum because Premier failed to

respond to the Trustee's demand letters regarding the turnover of the earnest money for a period

of approximately three months.  However, there is no Arizona precedent under which Premier

could be held absolutely liable on the facts before the Court.  The Court declined to enter the full

contempt sanction requested by the Trustee; however, it did enter a compensatory sanction

against Premier in the amount of the attorneys' fees and costs expended by the Trustee from the

time of the Trustee's original Motion to Enforce until the date of the Court's January 19, 2007

Memorandum Decision on the Application for Order to Show Cause.  At the time the

Memorandum Decision was entered, the parties had presented their respective positions on the

issues through their original pleadings, the Court had conducted oral argument, and the Court

had afforded the parties a final opportunity to present their relevant case law or evidence to the

Court through the supplemental briefing process.

      The Trustee filed his Motion for Reconsideration ten days after the Memorandum

Decision was entered.  The Motion for Reconsideration presents, among other things, an array of

new case law that was available to the Trustee at the time he filed his Application, along with an

extensive addendum of new exhibits, all of which were also available to the Trustee at the time

he filed his Application.  In the Motion for Reconsideration, the Trustee re-urges his request that

the sanction to be entered against Premier be the full amount of $330,000.

---

[1]The Application resulted from the failure of Premier to respond to, or appear at, the
hearing on the Trustee's "Motion to Enforce the Amended Sale Order by Directing Premier Title
Company as Escrow Agent to Deliver Forfeited Escrow Deposit to Trustee" ("Motion to
Enforce").  See Docket Entries No. 97 and 103.

2

Rules 59(e) and 60(b) provide for different motions directed to similar ends.[2] Rule 59(e) governs motions to "alter or amend" a judgment; Rule 60(b) governs relief from a judgment or order for various listed reasons. Rule 59(e) generally requires a lower threshold of proof than does 60(b), but each motion seeks to erase the finality of a judgment and to allow further proceedings. Rule 59(e) contains a strict ten-day deadline, while Rule 60(b) allows a year, sometimes more. Helm v. Resolution Trust Corp. 43 F.3d 1163 (7th Cir. 1995).

Rule 59 lists the grounds for seeking relief as being "any of the reasons for which new trials have heretofore been granted. . . ." Fed.R.Civ.P. 59(a) (West 2006). This section has generally been interpreted to provide three grounds for granting Rule 59 motions: (1) manifest error of law; (2) manifest error of fact; and (3) newly discovered evidence. School Dist. No. IJ Multnomah County, OR v. AcandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993); In re Gurr, 194 B.R. 474 (Bankr.D.Ariz. 1996). A motion for reconsideration is not specifically contemplated by the Federal Rules. To the extent it is considered by the Court, it is under Rule 59(e) to alter or amend an order or judgment. In re Curry and Sorensen, Inc., 57 B.R. 824, 827 (Bankr. 9th Cir. 1986).

Reconsideration is appropriate if the court is presented with newly discovered evidence, committed clear error or the initial decision was manifestly unjust, or if there is intervening change in controlling law. School Dist. No. IJ Multnomah County, OR v. AcandS, Inc., 5 F.3d 1255,1263 (9th Cir. 1993). A motion for reconsideration may properly be denied when the motion fails to state new law or facts. In re St. Paul Self Storage Ltd. Partnership, 185 B.R. 580 (9th Cir.BAP 1995). Such a motion has a limited purpose and should not be used to encourage the court to rethink that which it has already thought through. In re America West Airlines, Inc., 240 B.R. 34 (Bankr.D.Ariz. 1999). Neither should such a motion be granted when

---

[2] The Rules of Bankruptcy Procedure incorporate Rules 59(e) and 60(b) as Rules 9023 and 9024, respectively.

it is used as a vehicle to attempt to cure deficiencies in earlier submissions that were found to be

inadequate. In re Negrete, 183 B.R. 195, 197 (9th Cir. B.A.P. 1995). "Motions for

reconsideration . . . which advance supporting facts that were otherwise available when the

issues were originally briefed, will generally not be granted." Id. "Attempts to take a 'second

bite at the apple,' or pad the record for purposes of appeal (especially when new legal theories or

issues are not previously argued, but come to the mind of the losing party) are thus beyond the

intended scope of Rules 59 and 60." In re DEF Investments, Inc., 186 B.R. 671, 681

(Bankr.D.Minn. 1995).

       In this matter, every legal precedent cited and every exhibit presented in the

Trustee's Motion for Reconsideration was available to the Trustee at the time of the filing of the

original Application, at the time of the Trustee's Reply to Premier's Response, at oral argument

thereon, and during the period for supplemental briefing thereafter. However, said law and

exhibits were not presented until after the Court's Memorandum Decision had been rendered. A

Motion for Reconsideration may not be employed to take a "second bite at the apple" and

present new arguments to the Court after the first arguments have failed.[3] See In re Negrete, 183

B.R. at 197; In re DEF Investments, Inc., 186 B.R. 681. Accordingly, the Trustee's Motion does

not present a basis for reconsideration of this Court's Memorandum Decision. The Motion does

not provide a basis for reconsideration on any ground listed in Rule 59. Thus, the Court finds no

---

[3] Not only did the Trustee's Motion for Reconsideration present new arguments
available to the Trustee at the time of the original Application and oral argument, but the Trustee
persisted in attempting to present new arguments even after the Motion itself was filed. For
example, the Court's Order Setting Hearing on the Trustee's Motion for Reconsideration
required a Response from Premier at least one week prior to the hearing. If the Trustee had
desired to reply, he had ample time to prepare, serve, and file such a Reply prior to the hearing.
However, he did not follow such course of action. Rather, at oral argument on March 6, the
Trustee attempted to present yet additional case law to the Court. Such an action was contrary to
basic adversarial fairness, as opposing counsel had no opportunity to respond. The Court offered
both parties the opportunity to once again present their positions in supplemental briefing on the
Motion for Reconsideration, but they declined, and the Court deemed the matter under
advisement.

4

1    manifest error of fact or law or any newly discovered evidence.

2          Fed. R. Civ. P. 60(b) provides that on motion and just terms, the court may relieve

3 a party from a final judgment, order or proceeding for reasons listed in the Rule, including,

4 among others: mistake, inadvertence, surprise, or excusable neglect; newly discovered evidence

5 which by due diligence could not have been discovered in time to move for a new trial under

6 Rule 59(b); or any other reason justifying relief from the judgment. The bankruptcy courts, as

7 courts of equity, have power to reconsider, modify, or vacate their previous orders so long as no

8 intervening rights have become vested in reliance on orders. In re Lenox, 902 F.2d 737 (9th Cir.

9 1990). Although the bankruptcy rule governing relief from judgment on grounds of mistake,

10 inadvertence, surprise, or excusable neglect provides that the court may relieve a party from a

11 final order upon motion, it does not prohibit a bankruptcy judge from reviewing, sua sponte, a

12 previous order. In re Cisneros, 994 F.2d 1462 (9th Cir. 1993). Given the Trustee's recent

13 Motion, the Court will consider whether its Memorandum Decision should be vacated, in whole

14 or in part, under Rule 60(b) based on mistake, inadvertence, or similar grounds. The Court has

15 categorized the issues to be presented as whether the contempt sanction should be vacated or

16 modified, and whether the Trustee's argument regarding Premier's alleged absolute liability

17 requires a modification of the Memorandum Decision.

18

19 A. Contempt

20          The Trustee asks the Court to reconsider its failure to hold Premier in contempt

21 for the full amount of $330,000, relying, inappropriately, on certain cases that were available,

22 though never presented to the Court, prior to the entry of its Memorandum Decision. These

23 cases include Clements v. Coppin, 72 F.2d 796 (9th Cir. 1934), United States v. Asay, 614 F.2d

24 655 (9th Cir. 1980), and In re Gentry, 275 B.R. 747 (Bankr.W.D.Va. 2001). As noted

25 previously, from a legal standpoint, this Court need not consider these cases, since they are

26 outside the scope of a proper motion for reconsideration or to set aside an order of this Court.

27

28                                  5

However, since the Court believes that each of these cases is factually distinguishable from the case at bar, they will be briefly discussed herein.

The Decision of <u>Clements v. Coppin</u> arose under the Bankruptcy Act,[4] and involved a contempt proceeding against Ms. Clements, the widow of a man who had been a shareholder of a then-bankrupt corporation. 72 F.2d 796 (9th Cir. 1934). The Bankruptcy Act provided for "summary" or "plenary" proceedings, depending on the nature of the controversy. A summary proceeding could be resolved by a motion, whereas a plenary proceeding required the filing of a complaint in a court which had jurisdiction over the defendant, and afforded the defendant full procedural due process. A careful reading of the <u>Clements</u> Decision reveals that the District Court afforded Ms. Clements the protections of such procedural due process at the start of the turnover proceedings. Moreover, at the trial, the District Court concluded, after the presentation of evidence, that Ms. Clements was in possession of at least some of the funds that belonged to the bankruptcy debtor corporation. The District Court ordered that she turn over those funds to the bankruptcy trustee. The turnover order, entered by the Court, provided a ten-day period in which to comply. After said period expired, Ms. Clements untimely appeared before the Court and stated that she did not have the funds. The District Court noted that it was a bald assertion, unsupported by any offer of proof, nor any information concerning the nature of or any evidence that might support it. The Court denied her motion, entering an order to show cause why Ms. Clements should not be held in contempt. At the contempt hearing, Ms. Clements made an oral motion to reopen the District Court proceedings in order to show that she had no funds. This Motion was denied on the grounds of collateral estoppel. Ms. Clements initially took no action, failing to turn over the funds to the trustee or file a motion for

---

[4]The Bankruptcy Act has been superseded by The Bankruptcy Reform Act of 1978, as amended ("the Bankruptcy Code"). A thorough discussion of the procedural differences between the turnover proceedings under the Bankruptcy Act and the Bankruptcy Code is set forth in <u>U.S.A. Diversified Products, Inc. (Boyer v. Davis),</u> 193 B.R. 868, 875-879 (Bankr. N.D. Indiana 1995).

6

reconsideration. She then appealed the contempt order. The Ninth Circuit held that the contempt order would not be set aside, since Ms. Clements had not shown any impossibility to perform or other reason why she could not comply. Ms. Clements was precluded, by principles of collateral estoppel, from attacking the turnover order in a contempt proceeding. As an appellate court, the Ninth Circuit could not assist Ms. Clements. However, it noted that Ms. Clements could always return to the trier of fact, the District Court, and raise her inability to comply at any time. 72 F.2d at 799.

This matter is distinguishable from Clements. First, unlike in Clements, in which extensive litigation took place, Premier did not appear at any proceeding to establish its possession or nonpossession of the earnest money. The Trustee argues that he filed a Motion for Turnover on which this Court entered a Turnover Order on August 15, 2006 ("Turnover Order").[5] However, the Court entered the Order as a result of Premier's non-appearance. It was never established whether Premier actually had any funds. Moreover, the Trustee has utilized motion practice, rather than an adversary proceeding to obtain the default. Even in an adversary proceeding, commenced by the filing of a complaint and the issuance of a summons, a party may look to federal law to set aside the entry of default or a default judgment, and defaults entered based on non-appearance are liberally construed to allow a defaulting party to have its matter adjudicated on the merits. See Morris v. Peralta, 317 B.R. 381 (9th Cir. BAP 2004) (citing TCI Group Life Ins. Plan v. Knoebber, 244 F.3d 691, 696 (9th Cir. 2001) for the proposition that policy favors a decision on the merits, and that the "finality interest should give way fairly readily" in favor of adjudication on the merits). Moreover, in Clements, the Ninth Circuit stated only that collateral estoppel precluded Ms. Clements from raising the issue of whether she possessed the funds on appeal of a contempt order because the issue had been fully litigated. In the case at bar, the issue of Premier's possession was never litigated. "It is the general rule that issue preclusion attaches only when an issue of fact or law is actually litigated." Arizona v.

---

[5] See Docket Entry No. 104.

7

1   California, 530 U.S. 392, 414, 120 S. Ct. 2304, 2318-19 (2000) (internal citation omitted).

2   Accordingly, Premier was not estopped from raising the issue of its possession of the earnest

3   money at the contempt hearing before this Court.

4           Second, the August 2006 hearing involved a simple motion for turnover, which

5   the Trustee had described as a Motion to Enforce.  Under Bankruptcy Rule 7001, the procedure

6   for turnover is simplified, if the property which the trustee seeks to be turned over is in a

7   debtor's possession.  When the debtor files a bankruptcy petition, the debtor agrees initially to

8   place all of his or her exempt and non-exempt property within the Bankruptcy Court's

9   jurisdiction.  In exchange for the protection of the automatic stay and the potential ability to

10   obtain a discharge of certain pre-petition obligations, the debtor agrees to a more summary

11   procedure to have property of the estate ascertained and appropriately administered by the

12   trustee.  Obtaining the turnover of property held by a debtor which should be administered by the

13   trustee for the debtor's creditors is a summary proceeding.  However, Premier is not a debtor.

14   Procedural due process must be afforded to Premier or fundamental fairness is lacking.  See

15   Fed.R.Bankr.P. 7001(1) (defining as an adversary proceeding "a proceeding to recover money or

16   property, other than a proceeding to compel the debtor to deliver property to the trustee").

17   Further, it is not uncommon for parties to dispute the distribution of escrow funds, the property

18   at issue here.  Often, the funds held by an escrow company are interpleaded, with the Court to

19   determine who should receive the funds.  Thus, when escrow funds are at issue, it is especially

20   important that procedural formalities be followed.  See Id.  Such procedural due process was not

21   afforded here.  The Trustee did not file an adversary complaint.

22           Further, as noted above, Premier did not participate at the August 2006 hearing,

23   and an order based on Premier's default was entered against it, with no evidence being presented

24   by the Trustee.  A party, under appropriate circumstances, may request that the order entered as a

25   result of such a default hearing may be set aside if appropriate evidence or documentation is

26   submitted to the Court.  Indeed, even in the case relied upon by the Trustee in his current

27

28                                 8

Motion, the Ninth Circuit advised Ms. Clements that she still had the ability to return to the trial court to challenge the turnover order.  See 72 F.2d at 799 (hoding that Ms. Clements could return "at any time" to the District Court to present evidence of impossibility.)  As a trier of fact, this Court may, at any time, consider evidence of impossibility from Premier. After the August 2006 hearing, the Trustee filed an Application to hold Premier in contempt of Court.  Premier responded to this Application with appropriate evidence that it never obtained the funds to place in the escrow account.  The Court discussed Premier's impossibility of performance in its January 19, 2007 Memorandum Decision.  The Trustee has presented nothing in its current Motion which would cause this Court to reconsider or set aside its prior ruling.

The Trustee's reliance on United States v. Asay, 614 F.2d 655 (9th Cir. 1980), is also misplaced.  In Asay, an accountant was served with a summons to produce certain accounting papers to the Internal Revenue Service ("IRS").  Rather than producing the documents, Asay returned them to the taxpayers under investigation.  The IRS requested that the District Court enforce the IRS summonses, and at a subsequent hearing, at which Asay appeared, the Court ordered Asay to produce the papers.  Asay did not challenge the summonses and did not appeal the production order.  The IRS then applied for a contempt order.  At the contempt hearing, Asay argued that he did not have possession of the documents at issue, and so he could not be held in contempt.  The Court disagreed.  On appeal, the Ninth Circuit affirmed, stating that a self-created impossibility defense is no defense.  Id. at 660. Also, the Ninth Circuit held that Asay could not raise the impossibility defense on appeal of the contempt order, because he had failed to appeal the production order or to contest its validity, even though he had appeared at the hearing establishing that the production order was proper.  Id. at 661.

In this case, discovery and document production are not at issue.  Rather, this is a proceeding involving the turnover of property, which has different procedural safeguards. Moreover, Premier did not appear at the hearing at which the turnover order was entered.  Asay did.  Because Asay was present at the production hearing, was ordered to turn over the

9

documents, and then turned them over to the taxpayers, he created his own impossibility defense. Premier has presented no such "self-created" impossibility defense in this matter. Rather, a series of missteps created the problems herein. After the Trustee sold the property to the buyer at a Court auction, the Trustee continued to negotiate with the buyer. As a result, no proposed sale order was initially presented to the Court. Although the Trustee opened an escrow account, the Trustee was advised, and consented to, the transfer of the escrow account to Premier. However, at the time of the transfer, Premier had no Court Order concerning the sale. Quite simply, Premier had no final order from the Bankruptcy Court, outlining the terms and conditions of the sale, including what liens would be satisfied from the sale of the property, and the nature and type of the consideration to be paid by the buyer. In fact, the escrow instructions were not finalized by the Trustee, the buyer, and Premier until the very day that the sale was to close. It was the Trustee's buyer that created Premier's impossibility defense by failing to provide readily available funds to close the sale transaction. There is no question that Premier did not wrongfully disburse the funds (an offense for which Arizona law would impose absolute liability).[6]

Finally, the Trustee relies on the decision of In re Gentry, 275 B.R. 747 (Bankr.W.D.Va. 2001), as persuasive authority from another jurisdiction in support of his position. In the Gentry case, a debtor was ordered to turn over her tax refund, which she had received and spent. The Court held that the debtor had to turn over the value of the refund, since the actual refund had already been spent. However, the Court noted that to enter an appropriate turnover over, the debtor or party must first come into possession of the bankruptcy estate property. If possession did not occur, a turnover order could not be entered. Id. at 750. In Gentry, since the debtor had been in possession of property of the estate and improperly spent it,

---

[6] See Maganas v. Northroup, 135 Ariz. 573, 576, 663 P.2d 565, 569 (Ariz. 1983) (holding that escrow agents will face strict liability for deviating from terms of escrow agreement); Miller v. Craig, 27 Ariz. App. 789, 792, 558 P.2d 984, 987 (Ariz. App. 1976) (holding that escrow agent is strictly liable for wrongful disbursement of earnest money deposit).

a turnover over was appropriate.  The Court also refused to accept the debtor's "impossibility" defense. Money was not unique, but fungible.  Thus, although the debtor had long ago spent her refund, she was required to return to the estate the value of what she had received.

This Court does not find <u>Gentry</u> persuasive.  The Court may utilize a summary proceeding, such as a motion, to require a debtor to turn over funds to the trustee.  Moreover, there is no question that the debtor in <u>Gentry</u> actually had possession of bankruptcy estate property.  Finally, given the fungible nature of that property, the Court was also able to enter an order substituting the funds then held by the debtor as being appropriate for the turnover order, in lieu of the refund improperly spent by the debtor.  Premier is not a debtor, so additional safeguards must be accorded to it.  Additionally, Premier never obtained possession of the funds, since the buyer presented checks that were not supported by sufficient funds and a promissory note, which note was simply a promise to pay by the buyer.[7]  Finally, like the accountant in <u>Asay</u>, the debtor in <u>Gentry</u> created her own impossibility defense by spending the funds she was to turn over to the estate.  In the case at bar, as noted above, Premier did not create its own impossibility defense.

For the foregoing reasons, the Court finds that none of the cases cited by the Trustee warrants reconsideration of its decision.  Moreover, the Court emphasizes, as it did in its Memorandum Decision, that its civil contempt power is limited.  The Court has the power to enter a compensatory sanction or a coercive sanction only.  <u>In re Deville</u>, 361 F.3d 539, 550-53 (9th Cir. 2004); <u>In re Rainbow Magazine</u>, 77 F.3d 278, 284 (9th Cir. 1996).  Here, for reasons noted above, the Court cannot coerce Premier into turning over funds it never had.  Premier is not precluded from arguing nonpossession of the escrow funds by collateral estoppel, because the Court's Turnover Order was essentially a default proceeding, with an order entered on a motion only.  No facts or issues of law were conclusively determined at the August 2006

---

[7]As noted in this Court's January 2007 Memorandum Decision, there is nothing which precludes the Trustee from still suing the buyer on the note.

11

1  hearing; Premier was not afforded procedural due process; and it is not now estopped from

2  asserting to this Court, as the Ninth Circuit held to be proper in <u>Clements</u>, that it had no funds

3  and cannot turn them over.  As discussed in the Memorandum Decision, the nature of the

4  sanction requested by the Trustee approaches that of a criminal sanction.  This is especially so

5  when of the $330,000 amount again requested by the Trustee, Premier did not receive the sum of

6  $200,000 in readily available funds, and the sum of $100,000 was supported by a promissory

7  note, or a promise to pay by the buyer, a copy of which note is now in the Trustee's possession.

8          This Court may only enter a compensatory sanction against Premier.  Such a

9  sanction reflects the Trustee's damages in pursuing the Turnover Order.  The Court has

10  separately reviewed the attorneys' fees and costs now requested by the Trustee, and Premier's

11  objections thereto,  in a separate part of this opinion.

12

13  <u>B.  Absolute Liability</u>

14          The Trustee also requests that the Court reconsider its Memorandum Decision as

15  to its refusal to hold Premier absolutely liable for the amount of the earnest money deposit.

16  However, as with the contempt portion of the Memorandum Decision, the Trustee has presented

17  nothing to show that the Court made any mistake or manifest error of fact or law regarding

18  Premier's liability.  Rather, the Trustee has inappropriately presented certain evidence, available

19  to him prior to the entry of the Court's Memorandum Decision, attempting to explain why he

20  believes the Court should have decided the absolute liability issue in his favor.  As noted above,

21  the use of a Motion for Reconsideration to change the record on appeal or to present new

22  arguments is improper.  At oral argument on the Motion for Reconsideration, counsel for the

23  Trustee responded to Premier's assertion of an improper use of a such a motion by stating that

24  the parties could not predict what reasoning the Court would find persuasive in its Memorandum

25  Decision.  This response succinctly states the reason why the scope of a motion for

26  reconsideration is so limited: in the interest of efficiency and finality, the parties should have

27

28                                        12

1    made all of their arguments prior to the rendering of the Court's Memorandum Decision.

2    Further, the Court notes that the reasoning in its Decision was based at least, in part, on the cases

3    presented by the Trustee.  Moreover, the Trustee now attempts, by way of an exhibit, to present

4    factual evidence to the Court, which should have been presented at its initial hearing on the

5    Application concerning contempt.[8]  Such an addition of an exhibit to the record, without any

6    evidence to support it, is improper.

7                However, even if the Court were to consider the Trustee's newly presented

8    precedents and evidence, the Trustee still has not shown sufficient precedent or evidence on

9    which Premier could be held strictly liable for the entire amount of the earnest money deposit.

10   _____

11       [8]  The Trustee points out that the terms of the Escrow Agreement he now attaches as
     "Exhibit A" to his Motion for Reconsideration were contained within a Purchase Agreement that
12   was on the Court's docket prior to its Decision.  The Purchase Agreement was attached as an
     exhibit to the Trustee's "Motion to Authorize Sale of Estate Asset Free and Clear of Liens,
13   Claims, and Encumbrances with all Liens, Claims and Encumbrances to Attach to Sale
     Proceeds," filed March 15, 2006.  This docket entry was made more than six months prior to the
14   rendering of the Court's Decision and appears in the midst of more than 140 other entries.  If the
     Trustee wished the Court to consider the Escrow Agreement, the Trustee should have alerted the
15   Court that he wished to present the Agreement as support for his arguments.  However, in his
     Application and subsequent pleadings, the Trustee did not argue that the terms of the Agreement
16   were at issue, despite presenting Arizona law which clearly indicated that if the Agreement had
     been breached, such a fact would be directly relevant to the Trustee's argument.  See, e.g.
17   Maganas v. Northrup, 135 Ariz. 573, 576, 663 P.2d 656, 568 (Ariz. 1983) (cited in Trustee's
     Reply at 2 and Trustee's Supplemental Brief at 5).
18
         In addition to the Court's (and Premier's) unawareness that the Trustee might at some
19   future date take issue with the escrow terms subsumed in the Purchase Agreement, the Purchase
     Agreement on the docket was filed with the Court on March 15, 2006 and is entirely different in
20   form than the Escrow Agreement the Trustee now presents as "Exhibit A."  The Exhibit A
     Escrow Agreement is dated May 17, 2006.  Indeed, the final Sale Order as amended at the
21   parties' request was not presented to the Court for approval until May 18, 2006.  The terms of
     the Purchase Agreement as presented to the Court on March 15 might well have been altered in
22   the interim, and it would be unwise for the Court to take such a Purchase Agreement into
     consideration without having been prompted to do so by the parties.  Indeed, the attachment to
23   the Purchase Agreement allegedly containing the escrow terms looks nothing like the Escrow
     Agreement presented by the Trustee as Exhibit A.  The escrow terms presented on March 15,
24   2006 are contained in the "Title and Escrow" section of a standard form sale contract labeled as
     a "Purchase Offer."  The terms cover about three-quarters of a page.  Exhibit A, on the other
25   hand, contains substantially more terms and is a separate, two and one-half page contract.

26

27

28                                        13

1   The Escrow Agreement ("Escrow Agreement") which the Trustee now presents to the Court as

2   "Exhibit A" to his Motion for Reconsideration is dated May 17, 2006. The copy presented to the

3   Court is unsigned by the buyer, so it is unclear if the Escrow Agreement is, indeed, the operative

4   agreement between the parties. Even if the Court assumes that it was executed by the buyer and

5   is a legally binding agreement, the Court finds that Premier did not breach the Escrow

6   Agreement, because Premier had deposited the buyer's checks by May 17, 2006, the date of the

7   Agreement. Next, Paragraph 4 of the Escrow Agreement states that no check shall be "payment

8   into escrow" until the bank notifies the parties that the check has cleared. See Exhibit A. Unless

9   and until the checks cleared the bank, Premier had no duty under the Escrow Agreement to pay

10  funds out of escrow to the Trustee or anyone else. As the checks never cleared the bank, no duty

11  arose for Premier to pay funds to the Trustee. Finally, Premier made no agreement to guarantee

12  the payment of the buyer's funds. The buyer, not the title company, represented in the Escrow

13  Agreement that he would provide readily available funds to close escrow. Indeed, Premier made

14  few representations in the Escrow Agreement. Thus, the Trustee is still unable to show that

15  Premier breached the Escrow Agreement such that it should be held absolutely liable.

16          The Trustee next contends that the Court's statement in its Memorandum

17  Decision that the Trustee consented to the escrow being moved is a mistake of fact. Why this

18  makes Premier absolutely liable under an Escrow Agreement, dated May 17, 2006, which is the

19  only potentially operative agreement between the parties, is unclear. The Trustee states that the

20  escrow agent moved the escrow from Camelback Title to Premier, and later requested the

21  Trustee's approval three weeks after the escrow had been moved. However, the Trustee later

22  consented to the move of the escrow to Premier. So, if there was any breach by Premier of the

23  initial terms of the escrow, that breach was cured by the Trustee's subsequent consent. To the

24  extent that the Trustee argues that the move itself was a breach of the Escrow Agreement, the

25  Court sees no support in the record. As noted, the only operative Escrow Agreement between

26  the parties was executed by the Trustee and Premier on May 17, 2006. That Agreement provides

27

28                                          14

1  that the escrow shall be maintained by Premier with respect to the sale transaction with the

2  buyer.

3           The Trustee also argues that Premier engaged in fraudulent conduct by either

4  failing to deposit the funds immediately, or immediately notify the Trustee when the checks were

5  returned as being drawn on insufficient funds.  The Court finds that the checks were timely

6  deposited.  Because the Escrow Agreement was not signed by the Trustee until May 17, 2006,

7  and the Court's Sale Order was not signed until May 18, 2006, there was likely no reason for

8  Premier to deposit the funds prior to that time in order to be held absolutely liable for its actions.

9  Premier waited until it had authorization to proceed with the escrow before depositing the

10  checks, and given the date of the Escrow Agreement, the checks were deposited within a

11  reasonable time from the receipt of the funds.  Ms. Roth, stated at her deposition, that she opened

12  the escrow at Camelback with the buyer's check and with the purchase contract.  However, Ms.

13  Roth transferred to a new title company, and obtained the Trustee's consent to the transfer of the

14  escrow from Camelback to Premier.  Thereafter the Trustee continued to negotiate with the

15  buyer, and no sale order or escrow agreement was finalized by the parties until May 18 and May

16  17, 2006, respectively.   Ms. Roth did obtain the full amount of the additional earnest money

17  from the buyer.  She did initially provide a receipt to the Trustee, reflecting that certain funds

18  had been received by Premier.  The Sale Order presented by the Trustee to the Court did not

19  satisfy Premier, and the Order had to be presented again, even after May 17, the date the Escrow

20  Agreement was presumably executed by Premier, the Trustee, and the buyer.   At the time Ms.

21  Roth received the Court's Sale Order, she had no idea that the checks, placed in the account by

22  Premier,  were drawn on insufficient funds.  See Exhibit C to the Trustee's Motion, Deposition

23  of Beth A. Roth ("Deposition"), at 117.  The time of the deposit of the buyer's checks was so

24  close to close of escrow on the sale, however, that by the time Premier discovered the checks had

25  been dishonored as having insufficient funds, the sale closing date had passed.

26           The real property sold by the Trustee to the buyer was no longer part of the

27

28                                                    15

1  bankruptcy estate by May 26, because the Trustee had stipulated to the vacatur of the automatic

2  stay.[9]  However, there is no evidence that Ms. Roth was aware of this.  She had called the

3  buyer's realtor regarding the checks that had not been honored by the bank, and the realtor had

4  informed her that the buyer was still interested in the property and would provide funds to close

5  the transaction.  It should be noted that the real estate at issue had been sold to the buyer for

6  consideration in excess of millions of dollars; hence, the Trustee's request that the buyer provide

7  earnest money in the amount of $330,000.  Premier did not have any indication that the buyer

8  was engaging in any fraudulent conduct.  For instance, if the buyer had submitted checks

9  pursuant to an appropriate final sale order or escrow agreement, which had been dishonored,

10  then Premier would be put on notice that future checks received from the buyer might not be

11  supported by sufficient funds.[10]  However, the Trustee's delay in procuring a final sale order or

12  in finalizing the terms of the Escrow Agreement placed the parties in the difficult position of

13  depositing the checks in a deposit account shortly before the closing on the sale transaction.

14  Moreover, even after Premier determined that the checks could not be honored by the bank, the

15  buyer's broker was still assuring Premier that the buyer intended to place readily available funds

16  in his account so that the escrow could close.  To support this factual assertion, Premier submits

17  the deposition testimony of Ms. Roth that shortly after she received the Trustee's demand letter,

18  she called the office of the Trustee's counsel, as the letter instructed, and informed a paralegal at

19  the firm of the buyer's willingness to continue with the sale.  See Deposition at 120.  However,

20  after that, Ms. Roth never received a return phone call from the Trustee's counsel's office.  Id.

21  There is nothing in Ms. Roth's Deposition that suggests that she knew about the Trustee's

22

23      [9]  See Docket Entry Nos. 91, 92.  A Motion for a Stipulated Order Granting Stay Relief

24  was presented to the Court on May 19, 2006, the day after the parties presented their Amended
    Sale Order for Court Approval.

25      [10]  Cf. U.S. Life Title Co. of Arizona v. Bliss, 150 Ariz. 188, 722 P.2d 356 (Ariz.App.

26  1986) (holding that although industry practice was to accept checks as "good and genuine"
    payment, the escrow agent should have acted differently in the instance at issue because other

27  checks tendered by the buyer during the transaction had been dishonored).

28                                          16

urgency in recovering the money, or that the property had actually been subsequently sold at a
trustee's sale by one of the secured creditors in the case.

The Trustee argues that the foregoing facts are still evidence of "facts and
circumstances that a reasonable escrow agent would perceive as evidence of fraud." Under
Arizona law, an escrow agent has a duty to disclose such facts and circumstances that an escrow
agent may reasonably perceive as fraudulent to the parties to the escrow, or she herself may be
held liable for aiding or abetting the fraud. See, e.g., Burkons v. Ticor Title Co., 168 Ariz. 345,
353, 813 P.2d 710, 718 (Ariz. 1991). However, in this Court's view, Premier's handling of the
escrow seems to be indicative of, perhaps, negligence, rather than fraud. The Trustee's now
20/20 hindsight describes many actions as "mistakes," which, at the time, may have been
reasonable or within the parameters of normal business practice.

Moreover, the Arizona cases finding that the escrow agents aided or abetted a
fraud all involve fairly egregious intentional acts on the part of the escrow agents. For example,
in the case of Baker v. Stewart Title & Trust of Phoenix, Inc., 197 Ariz. 535, 5 P.3d 249
(Ariz.App. 2000), an attorney requested that the plaintiffs invest in certain limited partnerships.
The attorney then defrauded the plaintiffs by buying the properties under fictitious names and
reselling them to the limited partnerships at inflated prices. The escrow agent knew of the
attorney's fraudulent conduct. She helped establish the fictitious buyers' names in at least eight
of the escrows transactions. In one transaction, she notarized the signature of a fictitious person;
in another, she pretended to be the fictitious buyer in a face-to-face meeting with the seller. Id.
at 539; 5 P.3d at 253. The trial court held that the escrow agent was absolutely liable for her
participation in the fraud, and the Arizona Court of Appeals affirmed. No egregious criminal
acts similar to the acts of the escrow agent involved in Baker were undertaken by Ms. Roth in
the case at bar. It seems clear that Ms. Roth's actions, though they may now seem unwise, were
not made with any intent to harm the Trustee or shelter the buyer.

The Trustee relies on Wells Fargo Bank v. Arizona Laborers, Teamsters, and

1  <u>Cement Masons Local No. 395 Pension Trust Fund,</u> 201 Ariz. 474, 38 P.3d 12 (Ariz. 2002) for

2  the proposition that Premier's escrow agent's actions were enough to constitute "aiding and

3  abetting" fraud because Ms. Roth failed to disclose facts regarding the buyer's financial

4  condition to the Trustee.  The <u>Wells Fargo</u> case is factually inapposite to the case at bar.  In

5  <u>Wells Fargo</u>, a bank provided construction financing for a real estate project, and due to the

6  inability of the developer to pay, the loan was extended several times.  Permanent financing was

7  to be provided by a consortium of pension funds, but was conditioned upon the project

8  developer's solvency and financial stability.  It was alleged that the construction lender assisted

9  the developer in covering up his poor financial condition to ensure approval of the project's

10  financial status by the pension funds.  Indeed, the construction lender had failed to report various

11  illegal acts on the part of the developer, as required by federal law, and it had knowledge that the

12  financial statements submitted to the pension funds, and on which the pension funds were

13  relying, were false.  Given the magnitude of the financing provided by the construction lender, it

14  had a critical interest in ensuring that the pension funds provided the take-out financing of the

15  construction lender.  Moreover, the construction lender knew that the pension funds were relying

16  on financial statements from the developer which were false.  As a result, the Arizona Supreme

17  Court held that a genuine issue of material fact existed as to whether the construction lender had

18  aided and abetted the developer in defrauding the pension funds.  The Court reasoned that

19  "aiding and abetting liability is based on proof of a scienter . . . the defendants must <u>know</u> that

20  the conduct they are aiding and abetting is a tort."  <u>Id.</u> at 485, 38 P.3d at 24 (emphasis in

21  original).  A question of fact also existed as to whether the construction lender had engaged in

22  fraudulent concealment.  The Court noted that generally, a duty to speak must exist before

23  silence will be actionable.  <u>Id.</u> at 498, 38 P.2d at 36.

24      In this case, unlike the construction lender in <u>Wells Fargo</u> that had received

25  periodic payments from the developer, Premier had no ability to, and was not required to

26  pursuant to the Escrow Agreement,  assess the buyer's financial condition prior to the buyer's

27

28                                         18

1  checks actually being dishonored.   Additionally, the Trustee would argue that Premier knew of

2  the buyer's insolvency after the checks were returned for insufficient funds, but fraudulently

3  failed to disclose that information to the Trustee.  At the time, however, Ms. Roth did not know

4  that the property had been sold.  Rather, she telephoned the Trustee's counsel's office to notify

5  them that the buyer still wished to close escrow on the transaction.  Ms. Roth did not know that

6  the return of the dishonored checks was material, as the buyer's broker had represented that the

7  buyer would provide sufficient funds to close the transaction.  Given this representation, there

8  was no reason, at least on this record, for Ms. Roth to believe that the buyer was attempting to

9  commit a tort or defraud the Trustee.  The <u>Wells Fargo</u> Court held that scienter was an

10 indispensable element of aiding and abetting liability, but it is an element that is lacking herein.

11 Moreover, Arizona courts have generally refused to impose a duty on escrow agents to disclose

12 every occurrence related to a transaction when it would be nearly impossible for an escrow agent

13 to determine that such occurrences were indicative of fraud.  <u>See</u> <u>Maganas v. Northroup</u>, 135

14 Ariz. 573, 663 P.2d 565 (Ariz. 1983) (holding that escrow agent had no duty to disclose to a

15 party that his agent had unilaterally amended the escrow instructions to provide disbursement of

16 funds to the agent only); <u>Aranki v. RKP Investments</u>, 194 Ariz. 206, 979 P.2d 534 (Ariz.App.

17 1999) (holding that escrow agents have no duty to investigate on behalf of the parties to the

18 escrow to ensure that no misrepresentation is being made).

19         The Trustee further argues that Premier breached the implied duty of fair dealing

20 implicit in every Arizona contract.  Arizona law implies a covenant of good faith and fair dealing

21 in every contract, "the essence of which is that neither party will act to impair the right of the

22 other to receive the benefits which flow from their agreement or contractual relationship."

23 <u>Rawlings v. Apodaca</u>, 151 Ariz. 149, 153, 726 P.2d 565, 569 (Ariz. 1986); <u>Wagenseller v.</u>

24 <u>Scottsdale Memorial Hospital</u>, 147 Ariz. 370, 383, 710 P.2d 1025, 1038 (Ariz. 1985).  The focus

25 in determining whether the covenant was breached is an examination of the core of what the

26 parties agreed to in the contract.  <u>Rawlings</u> at 154, 726 P.2d 570.  However, the implied covenant

27

28                                           19

does not include "protection in excess of that which is provided for in the contract, nor . . . anything inconsistent with the limitations contained in the contract." Id. at 155, 726 P.2d 571. As discussed above, the Court concludes that the escrow agent acted in accordance with the essence of the Escrow Agreement: when she collected and held funds from the buyer. While her judgment may be questioned as the sale transaction unraveled, the agent continued to attempt to protect the Trustee's reasonable expectations under the Escrow Agreement. She re-deposited the dishonored checks, contacted the buyers' realtor, obtained a representation that the checks would be honored, and attempted to close the sale transaction at a later date than that originally contemplated by the parties. Upon examination of the wrong the Trustee asserts - loss of the escrow money - it is apparent that it was the buyer, not Premier, that deprived the Trustee of his reasonable expectations under the contract. Premier upheld the duty of fair dealing implied in the contract. The implied duty of good faith and fair dealing does not expand a contract to provide additional protection, and nowhere in the Escrow Agreement did Premier agree to guarantee the buyer's funds.

Finally, the Trustee argues that the Court's August 15, 206 Turnover Order should somehow impose absolute liability on Premier. As explained at length in the Memorandum Decision, and unfortunately herein, the Turnover Order was the wrong procedural vehicle to achieve the objectives sought by the Trustee. The Turnover Order itself was never actually litigated, but entered on default basis. This Court made no determination as to whether Premier possessed any property of the bankruptcy estate. Premier cites the Court to the decision of In re Muniz, 320 B.R. 697 (Bankr.D.Colo. 2005), for the proposition that a party must demonstrate that its opponent both received, and had possession of, the property sought to be turned over at the time the turnover order was entered.[11] That case requires that a motion for

---

[11] Premier asserts that the burden of proof of possession is clear and convincing evidence. This Court follows the Grogan v. Garner holding that, unless explicitly stated otherwise in the Code or Rules, a preponderance of the evidence standard is appropriate for civil actions in which fundamental rights are not at stake. 498 U.S. 279, 286, 111 S.Ct. 654, 659

20

turnover allege possession and value, in order to fulfill procedural due process and fundamental fairness. This is somewhat different than this Court's turnover procedure; however, it is clear that a party never having had possession of property of the estate cannot be forced to turn it over. It is also clear, as discussed above, that turnover from a party other than a debtor is not a summary proceeding, but rather requires the protections ordinarily afforded to parties embroiled in a matter commenced with the filing of a complaint and the service of a summons.

The Trustee may proceed in negligence against Premier or he may elect for some other remedy, such as to proceed against the buyer. However, attempting to enforce an invalid Turnover Order is not the proper method for redressing the Trustee's loss. The Court makes no determination as to the merits of any of the above actions, which are listed for purposes of demonstration only. The Court also emphasizes that its original Memorandum Decision was not intended to address or resolve the merits of any such action, or similar actions, in any way.

C. Attorney's Fees.

At the hearing on the Trustee's Motion for Reconsideration, the parties requested that this Court resolve the issue of attorneys' fees and costs without any further briefing or hearing on the matter. The Trustee has submitted affidavits from his counsel reflecting that counsel has incurred the sum of $25,659.50 in attorneys' fees and $2,427.57 in costs, after taking a reduction in fees of $787.50.[12] Premier now questions the reasonableness of these fees and costs in a response to the affidavits. Premier focuses on two areas of concern: the fees incurred by Trustee's counsel in preparing for, and taking, the deposition of Ms. Roth; and the fees

_____

(1991). The Court need not resolve this issue, since even under the preponderance of the evidence standard, the Trustee has not met his burden of proof.

[12] See Docket Entry Nos. 137, 140, 141. One of the partners at the Trustee's law firm had agreed not to charge his time to attend the deposition of Ms. Roth. Hence, counsel's voluntary reduction of fees in the amount of $787.50.

21

incurred by Trustee's counsel in reviewing certain litigation between Camelback Title and Premier, which Premier asserts is unrelated to the current controversy between the parties. The Court has reviewed the affidavits, pleadings, and exhibits presented by the parties. The Court agrees that the use of six attorneys by Trustee's counsel to take the deposition of Ms. Roth is excessive. Whenever so many attorneys are involved on a relatively discrete issue, there is inevitably duplication of services and excessive time expended on the matter. An appropriate amount of time to be expended on the matter would have been the 18.1 hours of J. Romero, at a cost of $3,167.50, and the 2.2 hours of G. Manoil, at a cost of $209.00, for the aggregate amount of $ 3,376.50. These individuals had the primary responsibility to review the file, analyze those documents that would be presented, outline the issues and areas to be covered with Ms. Roth, and conduct the deposition. Therefore, the Court agrees with Premier that the amount of $5,638.50 is an excessive amount of time to be expended in preparing and conducting a straight-forward deposition. Although $787.50 has already been deducted, as noted in note 12, the Court concludes that the balance of the time must also be deducted other than the time outlined above of Romero and Manoil.

Premier also questions why the deposition of Ms. Roth was necessary. Given the dispute between the parties and the Trustee's initial belief that Ms. Roth had acted improperly, the Court believes that the deposition of Ms. Roth was appropriate to determine what actions she took and when and what information she had in her possession from the various parties engaged in the closing of escrow of bankruptcy estate property and when. The Court has already outlined, however, why the fees of Trustee's counsel should be reduced.

Premier also questions why the lawsuit between Camelback Title and Premier had to be investigated on the issue of the turnover of property. Unfortunately, Premier has taken the position that it no longer has the original promissory note given by the buyer, to be placed in escrow, and which was part of the consideration to be paid by the buyer for bankruptcy estate property. Instead it has only turned over a copy of the promissory note to the Trustee. Given Premier's position, it was not unreasonable for the Trustee's counsel to explore the litigation

between Camelback Title and Premier. It is possible that said litigation would have disclosed one or more notes or other consideration that was transferred between the title companies, or lost in the process, when a number of officers or employees of Camelback Title transferred to Premier. In this matter, Ms. Roth, Ms. Stobbe, and perhaps other employees involved in the escrow transaction with the Trustee and the buyer had previously been employed by Camelback Title and then moved the escrow account which is the subject of the dispute between the parties herein to Premier. The Court concludes that the time expended by the Trustee's counsel in reviewing the litigation between Camelback Title and Premier was relevant to the proceedings herein, and the amount of time expended and the hourly charged are reasonable. The Court overrules Premier's objection to the attorneys' fees as to this issue.

## IV. CONCLUSION

The Court concludes, as a matter of fact and law after its review of the affidavits, that the Trustee is entitled to his attorneys' fees of $24,185.00[13] and costs of $2,427.57, in the total amount of $26,612.57 as a compensatory sanction.

Based on the foregoing,

The Court concludes that the Trustee's Motion for Partial Reconsideration must be DENIED. The Trustee shall be awarded a compensatory sanction in the amount of $26,612.57, representing the sum of $24,185.00 in attorneys' fees, and the sum of $2,427.57 in costs. The Court shall execute a separate order of this Court incorporating this Decision.

Dated this 10th day of May, 2007.

The Honorable Sarah Sharer Curley
United States Bankruptcy Judge.

BNC to Notice

---

[13]$26,446.50 minus voluntary reduction of $787.50 equals $25,659 minus Court reduction of $1,474.50 ($4,851.00 in fees remaining for Roth deposition that are still being charged minus $3,376.50 in allowed fees for the deposition equals $1,474.50 in fees that still need to be reduced from amount awarded) equals final award of attorneys' fees of $24,185.00.

23